IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| SUMMER LANG, individually and on behalf of all others similarly situated, | : : : : | |
|  | : | Civil Action No. |
| Plaintiff; | : : | |
| v. | : : | |
| ZAAPPAAZ, INC. d/b/a WB Promotions, Inc., Wrist-Band.com and Customlanyard.net; CUSTOM WRISTBANDS INC. d/b/a Kulayful Silicon Bracelets, Kulayful.com, Speedywristbands.com, Promotionalbands.com, Wristbandcreation.com, and 1inchbracelets.com; NETBRANDS MEDIA CORP. d/b/a 24hourwristbands.com and imprint.com f/k/a Lightbeam, Inc.; CASAD COMPANY d/b/a Totally Promotional; BRANDECO, L.L.C. d/b/a brandnex.com; AZIM MAKANOJIYA; MASHNOON AHMED; CHRISTOPHER ANGELES; and AKIL KURJI; | : : : : : : : : : : : : : | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| Defendants. | : : | |

## INTRODUCTION

Plaintiff Summer Lang ("Plaintiff"), individually and on behalf of all other similarly-situated individuals and entities who have purchased customized promotional products directly, brings this action under Section 1 of the Sherman Act, against Zaappaaz, Inc. d/b/a WB Promotions, Inc., Wrist-band.com and Customlanyard.net ("Zaappaaz"); Custom Wristbands Inc. d/b/a Kulayful Silicone Bracelets, Kulayful.com, Speedywristbands.com, Promotionalbands.com, Wristbandcreation.com and 1inchbracelets.com ("Custom Wristbands"); Netbrands Media Corp. d/b/a 24hourwristbands.com and imprint.com ("Netbrands"); Casad Company d/b/a Totally Promotional ("Casad"); Brandeco, LLC d/b/a brandnex.com ("Brandeco"); Azim Makanojiya ("Makanojiya"); Mashnoon Ahmed ("Ahmed"); Christopher Angeles ("Angeles"); and Akil

Kurji ("Kurji") (collectively, "Defendants"). In support therefore she alleges, as to herself, based on personal knowledge, and in all other respects, based upon information and belief, as follows:

## NATURE OF THE ACTION

1. This action arises out of a Department of Justice investigation into a conspiracy to fix prices for customized promotion products. From at least June 2014 to at least June 2016, with anticompetitive effects continuing to the present, Defendants used text messages; online messaging platforms such as Facebook, Skype and WhatsApp; and in-person meetings to communicate with coconspirators and reach agreements to fix and maintain prices for certain customized promotional products, specifically customized silicone wristbands, customized lanyards, and customized pin buttons (collectively, "Customized Promotional Products").[1]

2. Customized Promotional Products are small, inexpensive items often used by businesses or other organizations for promotional purposes such as advertising or marketing a given brand or piece of information. Individuals also purchase promotional products for various reasons. These products are generally imprinted with a brand name, slogan, person's name, or some other bit of text or imagery at the customer's request. For example, Plaintiff purchased silicone wrist-bands with an anti-cancer slogan to raise money for a friend who was diagnosed with metatastic breast cancer.

3. To date, the DOJ investigation into the Customized Promotional Products conspiracy has resulted in guilty pleas by the following Defendants: (1) Zaappaaz; (2) Makanojiya (Zaappaaz's founder and President); (3) Custom Wristbands; and (4) Angeles (Custom Wristbands' owner and Chief Executive Officer). All pled guilty to price-fixing in

---

[1] *E-Commerce Company and Top Executive Agree to Plead Guilty to Price-Fixing Conspiracy for Customized Promotional Products*, THE UNITED STATES DEPARTMENT OF JUSTICE (August 7, 2017), https://www.justice.gov/opa/pr/e-commerce-company-and-top-executive-agree-plead-guilty-price-fixing-conspiracy-customized, last accessed Jan. 3, 2018.

2

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.[2]  In addition to their guilty pleas, Defendant Zaappaaz agreed to pay a $1,923,245 criminal fine and Defendant Custom Wristbands agreed to pay a $409,342 criminal fine.[3]

4.     The horizontal price-fixing conspiracy alleged herein constitutes a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1.  Defendants' conduct has had the purpose and effect of restraining trade and harming competition resulting in supracompetitive prices paid for certain Customized Promotional Products.

5.     The proposed Class is comprised of direct purchasers of Customized Promotional Products from one of the Defendants from June 2014 to the present ("the Class Period").  It is believed there are thousands of similarly-situated direct purchasers of Customized Promotional Products who paid artificially-inflated prices due to Defendants' unlawful anticompetitive conduct.

## PARTIES

6.     Plaintiff Summer Lang is an individual who resides in Goodyear, Arizona.  Plaintiff purchased customized silicone wristbands directly from Zaappaaz's website Wrist-Band.com during the Class Period.

7.     Defendant Zaappaaz, Inc. is a privately-held Texas corporation with its principal place of business at 1305 El Camino Village Dr., Houston, Texas, 77058-3081.  Zaappaaz does

---

[2] *See United States v. Zaappaaz, Inc.*, Criminal Action No. 4:17-cr-0477 (S.D. Tex.) (Nov. 30, 2017 Docket Entry); *United States v. Makanojiya*, Criminal Action No. 4:17-cr-0478 (S.D. Tex.), Dkt. 33; *United States v. Angeles*, Criminal Action No. 4:17-cr-509 (S.D. Tex.) (Dec. 21, 2017 Docket Entry); *United States v. Custom Wristbands Inc.*, Criminal Action No. 4:17-cr-510 (S.D. Tex.) (Dec. 21, 2017 Docket Entry).

[3] *See United States v. Zaappaaz, Inc.*, Criminal Action No. 4:17-cr-0477 (S.D. Tex.), Dkt. No. 37; *United States v. Custom Wristbands Inc.*, Criminal Action No. 4:17-cr-510 (S.D. Tex.) (Dec. 21, 2017 Docket Entry).

business online under the names "WB Promotions, Inc.", "Wrist-Band.com" and "Customlanyard.net," selling Customized Promotional Products throughout the United States.

8. Defendant Azim Makanojiya is the president of Defendant Zaappaaz and domiciled in the State of Texas.

9. Defendant Custom Wristbands Inc. is a California corporation with its principal place of business at 4416 W. Verdugo Ave., Burbank, California, 91505. Custom Wristbands does business online under the names of "Kulayful Silicone Bracelets", "Kulayful.com", "Speedywristbands.com", "Promotionalbands.com", "Wristbandcreations.com" and "1inchbracelets.com," selling Customized Promotional Products throughout the United States.

10. Defendant Christopher Angeles is the owner and Chief Executive Officer of Defendant Custom Wristbands and is domiciled in the State of California.

11. Defendant Netbrands Media Corp. is a Texas corporation with its principal place of business at 14550 Beechnut St., Houston, Texas, 77083-5741. Netbrands does business online under the names "24hourwristbands.com" and "imprint.com," selling Customized Promotional Products throughout the United States. On information and belief, Netbrands previously operated as Lightbeam Inc., a former Delaware corporation which had a principal place of business at 4850 Wright Rd., Suite 100, Stafford, Texas, 77477-4116. Lightbeam Inc. also did business as "lightbeamlabs.com."

12. Defendant Mashnoon Ahmed is the President of Netbrands and is domiciled in Texas.

13. Defendant Casad Company, Inc. ("Casad") is an Ohio corporation with its principal place of business at 450 South Second Street, Coldwater, OH 45828. The founder and President of Casad is Thomas Casad. Casad does business online under the name

4

"totallypromotional.com," selling Customized Promotional Products throughout the United States.

14. Defendant Brandeco, L.L.C. ("Brandeco") is a Texas limited liability company with its principal place of business at 8181 Commerce Drive, Suite 700, Houston, TX 77036. Brandeco does business online under the name "BrandNex.com," selling Customized Promotional Products throughout the United States.

15. Defendant Akil Kurji controls Brandeco, is Chief Executive Officer of BrandNex.com, and is domiciled in Texas.

## JURISDICTION AND VENUE

16. The claim set forth in this Complaint arises under Section 1 of the Sherman Act (15 U.S.C. § 1), and Plaintiffs seek treble damages pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15(a)). This Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. §§ 1331 and 1337(a).

17. Venue is proper in the Southern District of Texas under 28 U.S.C. §1391(b) and 15 U.S.C. § 22 because (a) Defendants reside, transact business, committed an illegal or tortious act, have an agent, and/or are found in this District, and (b) a substantial portion of the events described below have been carried out in this District.

18. This Court has personal jurisdiction over each Defendant because each Defendant transacted business within, and is subject to personal jurisdiction within, the Southern District of Texas. The Defendants sell custom promotional products to consumers located in the Southern District of Texas.

19. At all material times, the Defendants sold Custom Promotional Products to customers across the United States, operating in a continuous and uninterrupted flow of

5

commerce across state lines. Defendants' conduct alleged herein has substantially affected interstate commerce.

## CLASS ALLEGATIONS

20. The Plaintiff brings this action under Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of herself and the following class (the "Class"):

> All persons and entities in the United States (but excluding Defendants, their parents, predecessors, successors, subsidiaries, affiliates, as well as federal government entities) that directly purchased Customized Promotional Products from any or all of the Defendants at any time during the period from at least June 2014 to the present ("Class Period").

21. Members of the Class are so numerous that joinder is impossible. The Class includes thousands of consumers.

22. There are numerous questions of law and fact common to the class, including, without limitation:

   (a) when each Defendant joined the alleged price-fixing conspiracy;

   (b) whether Defendants colluded to set the price of Customized Promotional Products in the United States;

   (c) whether Defendants' conduct raised the price of Customized Promotional Products in the United States, and by how much;

   (d) whether Defendants' conduct as alleged herein constitutes a *per se* violation of the antitrust laws; and

   (e) whether, and to what extent, Defendants' conduct caused direct purchasers of Customized Promotional Products to pay supracompetitive prices, and thereby, to suffer antitrust injuries.

These, and other common questions of law and fact, predominate over any questions affecting only individual Class members.

23. Plaintiff's claims are typical of the claims of the Class, because all Class members suffered antitrust injuries in the same way as a result of Defendants' wrongdoing, and the claims

6

of each Class member arise out of the same essential facts and are based on the same legal theories.

24. Plaintiff will fairly and adequately represent and protect the interests of the Class.

25. Plaintiff has retained counsel experienced in class action antitrust litigation, and Plaintiff has no interest in this litigation that conflicts with the interests of the other members of the Class.

26. A class action is superior to any other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty for the Court in managing the claims of the Class that would preclude class certification.

**OVERVIEW OF THE CUSTOMIZED PROMOTIONAL PRODUCTS INDUSTRY**

27. According to the Promotional Products Association International, the promotional products industry had total sales in the United States of $21.3 billion in 2016.

28. Common promotional items include pens, calendars, T-shirts, coffee mugs, key chains, badge holders, wristbands, lanyards and pin buttons.

29. Businesses often use customized promotional items by giving them out at trade shows to advertise the business, giving them to customers to further brand loyalty, or giving them to their own employees as gifts. Individuals also purchase customized promotional items for numerous uses such as to raise money or awareness for a particular cause.

30. Beginning in the early 2000s, much of the ordering for promotional products began to be done online, which, for the first time, allowed customers to easily compare the prices for ordering a given type of customizable promotional product according to one's need. In turn, this intensified the pressure for companies producing customizable promotional products to compete on price, types of products offered, quality, speed of delivery, and by product feature.

7

31.     Silicone gel wristbands first became popularized in 2004 when the Livestrong Foundation, cycling champion Lance Armstrong's cancer charity, and Nike launched a yellow silicone gel wristband with the imprint "LIVESTRONG" as a symbol for cancer awareness.  The Livestrong Foundation would eventually sell over 80 million wristbands.[4]

32.     Silicone wristbands are extremely easy to produce, using extruded silicone rubber, which is compressed to a pre-selected width (most commonly one-half inch).  The rubber is predyed, and the customer can select whether he or she wants the customized printing to be debossed (recessed), embossed (raised), colored debossed, or screen-printed, among other options.  Most silicone wristbands are 7 or 8.5 inches in circumference and are approximately one-tenth of one inch thick, and are heavily standardized across the industry.[5]

33.     The production of customized lanyards is very similar to that of customized silicone wristbands except instead of using extruded silicone rubber, most lanyards are made from polyester, nylon, or other easy-to-produce synthetic materials. As with customized silicone wristbands, the customer can easily select the type and style of printing, along with other standard aspects of production, including the clasp and the badge holder.  The turnaround time for lanyards is generally low (similar to that of customized silicone wristbands) and they can be ordered on little notice, often shipped from China or other countries in Asia.

34.     Customized pin buttons are buttons or badges that attach to an article of clothing using an attached safety pin.  Most pin buttons are flat or rectangular, and they carry images or messages.   Customized pin buttons are produced in a method very similar to that of customized

---

[4] Connor Simpson, *Lance Armstrong Killed the Livestrong Bracelet*, THE ATLANTIC (May 28, 2013), https://www.theatlantic.com/business/archive/2013/05/nike-livestrong-lance-armstrong/314850/, last accessed on Jan. 3, 2018.

[5] *See* http://www.thomasnet.com/articles/plastics-rubber/silicone-bracelet-design, last accessed Jan. 3, 2018.

silicone wristbands and lanyards. The pins are standardized across a range of options, such as size and shape, with a front message or image can be chosen almost entirely by the customer. While some customized pin buttons are installed on keychains or have magnetic backings instead of using safety pins, they are all considered to be "customized pin buttons" within the industry meaning of the term. The turnaround times for customized pin buttons are also generally low, and they can be ordered on little notice, also often shipped directly from China or other countries in Asia.

35. Most production facilities are located in China or other countries in Asia where production can occur very quickly and the products can be rapidly shipped to the United States. However, some production is done in the United States, and Defendants (and other competitors) often charge a premium for Customized Promotional Products that they claim to be "Made in the USA."

36. At least one Defendant, Zaappaaz, owns manufacturing facilities in China that are strategically located close to the airport to facilitate expedited delivery of their products.[6]

37. All corporate Defendants' ordering systems for customized silicone wristbands and/or lanyards are highly similar. In order, a customer chooses a type of printing (e.g., printed, embossed, etc.), a width, a color, a customized message, a logo or picture, a method of bagging, and finally, the type or speed of shipping and/or production. For customized pin buttons use a pre-set selection of sizes and shapes of buttons, upon which a custom image or message is printed.

---

[6] *See* Raif Karerate, A school project spawned into a multimillion dollar company for Azim Makanojia, AMERICAN BAZAAR ONLINE (Jan. 19, 2015) https://www.americanbazaaronline.com/2015/01/19/school-project-spawned-multimillion-dollar-company-azim-makanojia/, last accessed Jan. 3, 2018.

38. For each Defendants' websites, the prices for the products – whether it be silicon bracelets, lanyards or pin buttons – are clearly quoted at the bottom of the ordering screen. It is very easy for customers to compare prices across websites by entering similar, or identical, orders on each website.

39. Because of the low cost of manufacturing and shipping, and the ease of ordering online and comparing offers from different vendors, prices would be kept to a low level in the absence of collusion between the Defendants.

40. Defendants' anticompetitive actions resulted in supracompetitive prices and profits at the expense of consumers of promotional products.

## THE PRICE-FIXING CONSPIRACY

41. In 2007, Defendant Makanojiya, then a student at the University of Houston, was visiting a trade show in China when he saw how customized silicone wristbands could be mass produced. Inspired by the Livestrong wristbands, and not aware of any website in the United States that allowed consumers to design their own customized wristbands, he created Wrist-Band.com.[7]

42. Defendant Netbrands was also founded in 2007. Netbrands was founded by Defendant Ahmed, Aziz Mansoor and Mueen Akhter.

43. In 2010, Netbrands sued Zaappaaz, Makanojiya, and several of Makanojiya's family members who were involved with Zaappaaz, alleging that they, along with a company they hired in India, submitted fake orders on Netbrands' website to figure out how the Netbrands' ordering process worked. Netbrands alleged that the purpose of this trickery was to allow Zaappaaz to duplicate that ordering process on their website, and then offer products and

---

[7] *See id.*

services similar to Netbrands' on their own website. Netbrands' complaint alleged that Zaappaaz copied large portions of its website exactly, including images, and offered the same or substantially similar services and products at prices 30-40% less than Netbrands' prices.[8]

44. The case was settled in 2011,[9] providing an opportunity for these former competitors to instead collude and fix prices.

45. From at least 2014 through at least June 2016, Defendant Zaappaaz's personnel, and specifically Makanojiya, attended meetings and communicated through online messaging platforms (e.g. Facebook, Skype, and WhatsApp), with other Defendants to fix the prices of Customized Promotional Products.

46. From at least June 2014 through at least June 2016, Defendant Custom Wristbands' personnel, and specifically Angeles, attended meetings and communicated in person and online through text messaging and online messaging platforms, with other Defendants to fix the prices of Customized Promotional Products.

47. In January 2016, a Houston-based wristband seller (the "Whistleblower") was approached about joining the cartel by Defendants Ahmed (Netbrands) and Kurji (Brandeco) through text messages and Facebook messages.

48. Defendant Kurji (Brandeco) told the Whistleblower that Brandeco, Custom Wristbands, Netbrands and Zaappaaz all agreed to fix prices rather than compete. The Whistleblower notified the government about the communication and agreed to wear a wire to

---

[8] *Lightbeam, Inc. and Net Brands Media Corp. v. Zaappaaz, LLC d/b/a Wrist-Band.com et al.*, Civil Action No. 10-cv-405 (S.D. TX.) (filed Feb. 2, 2010) [Lightbeam was Netbrands' parent company at the time of the litigation.], at Dkt. No. 29.

[9] *See id*. at Dkt. Nos. 26-31.

11

record conversations with Defendant Ahmed (Netbrands), Kurji (Brandeco), and Makanojiya (Zaappaaz).

49.     In recorded conversations with the Whistleblower, Defendants Ahmed (Netbrands), Kurji (Brandeco), and Makanojiya (Zaappaaz) discussed pricing, the private WhatsApp group that was used to discuss pricing, and the restaurants where they would meet to agree on pricing.

50.     In June 2016, the FBI conducted simultaneous raids of the offices of Netbrands, Brandeco and Zaappaaz.

51.     Based on information obtained from its investigation, the FBI had reason to believe that Defendant Casad was involved in the cartel. In July 2017, the FBI investigated Defendant Casad's offices for seven hours.[10]

52.     In November 2017, Defendants Zaappaaz and Makanojiya pled guilty in the Southern District of Texas to violating the Sherman Act by conspiring with other Customized Promotional Products companies to fix prices. Zaappaaz agreed to pay a $1,923,245 fine as part of the plea deal.[11]

53.     In December 2017, Defendants Custom Wristbands and Angeles pled guilty in the Southern District of Texas to violating the Sherman Act by conspiring with other Customized

---

[10] See Christopher Ruvo, *FBI Investigates at Ohio Promo Firm*, https://www.asicentral.com/news/web-exclusive/july-2017/fbi-investigates-at-ohio-promo-firm/, last accessed on January 3, 2018.

[11] See *United States v. Zaappaaz, Inc.*, Criminal Action No. 4:17-cr-0477 (S.D. Tex.) (Nov. 30, 2017 Docket Entry), Dkt. 37; *United States v. Makanojiya*, Criminal Action No. 4:17-cr-0478 (S.D. Tex.), Dkt. 33.

Promotional Products companies to fix prices. Custom Wristbands agreed to pay a $409,342 fine as part of the plea deal.[12]

## RELEVANT MARKETS

54. Defendants' horizontal price fixing is a *per se* violation of Section 1 of the Sherman Act. Therefore, Plaintiff is not required to define a relevant market.

55. Alternatively, if the Court determines that Plaintiff's Sherman Act claim cannot proceed under a theory of *per se* horizontal price fixing, Defendants' anticompetitive conduct and agreements constitute a violation of the Sherman Act under the "rule of reason." In that case, the relevant market is the online market for Customized Promotional Products in the United States.

56. Defendants operate websites which advertise and sell Customized Promotional Products throughout the United States using online platforms.

57. Defendants' market share for Customized Promotional Products is not specifically known because marketing information sufficient to determine market share is unknown or unpublished. However, Defendants Brandeco, Casad, Custom Wristbands, Netbrands, and Zaappaaz each claim to be a leader in the industry and, upon information and belief, collectively they possess a high market share in the Customized Promotional Products industry.

58. There are no reasonably available substitutes for Customized Promotional Products that are ordered online and manufactured to a customer's specifications then shipped directly to the customer. If a customer could find a local business willing to create comparable

---

[12] *See United States v. Angeles*, Criminal Action No. 4:17-cr-509 (S.D. Tex.) (Dec. 21, 2017 Docket Entry); *United States v. Custom Wristbands Inc.*, Criminal Action No. 4:17-cr-510 (S.D. Tex.) (Dec. 21, 2017 Docket Entry).

Customized Promotional Products, they would be far more expensive than those mass produced using modern high-technology equipment and sold by the Defendants.

59. As a result of their anticompetitive agreements, the Defendants sell Customized Promotional Products at prices well in excess of their marginal costs and the competitive price. The Defendants have enjoyed artificially high profit margins, especially when compared with online retailers of other types of mass-produced consumer goods.

## **INTERSTATE COMMERCE**

60. Defendants manufactured and/or sold Customized Promotional Products in the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

61. Defendants' business activities substantially affected interstate commerce in the United States and caused antitrust injury throughout the United States.

## **HARM TO COMPETITION DUE TO THE CONSPIRACY**

62. The anticompetitive conduct described in this Complaint enabled Defendants to maintain prices above competitive levels, to the detriment of Plaintiff and other members of the Class. This harm to the Plaintiff and other Class members, in the form of paying artificially inflated prices for Customized Promotional Products, constitutes cognizable antitrust injury and harm to competition under the antitrust laws.

63. There are no legitimate procompetitive justifications for the anticompetitive conduct alleged in this Complaint, and even if there were, there are less restrictive means of achieving any such purported procompetitive effects. To the extent that Defendants' anticompetitive conduct, or any aspect of their conspiracy, has any cognizable procompetitive effects, they are substantially outweighed by the anticompetitive effects.

## ANTITRUST INJURY TO PLAINTIFF AND MEMBERS OF THE CLASS

64. During the Class Period, Plaintiff and members of the Class purchased Customized Promotional Products from Defendants. Defendants' anticompetitive conduct alleged herein caused members of the Class to pay prices for Customized Promotional Products that were inflated above competitive levels during and throughout the Class Period.

65. If Defendants had not conspired with one another to fix prices, Plaintiff and members of the Class would have paid substantially lower prices for Customized Promotional Products during and throughout the Class Period.

66. Because Defendants were successful in price fixing, Plaintiff and members of the Class have sustained, and continue to sustain, substantial losses in the form of artificially inflated prices paid to Defendants. The full amount of such damages will be calculated after discovery and upon proof at trial.

67. Injury to Plaintiff and members of the Class was a direct and foreseeable result of Defendants' anticompetitive conduct.

68. On information and belief, Defendants' anticompetitive conduct and/or its effects is continuing, and therefore, so are the overcharges suffered by Plaintiff and the Class caused by Defendants' conduct.

69. The foregoing allegations are likely to have evidentiary support after a reasonable opportunity for discovery.

## CLAIM FOR RELIEF

**Violation of Section 1 of The Sherman Antitrust Act (15 U.S.C. § 1)**

70. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

71. As set forth above, Defendants were competitors in the market for Customized Promotional Products.

72. In violation of Section 1 of the Sherman Act, Defendants entered into agreements with one another to fix, maintain and stabilize the prices of Customized Promotional Products at supracompetitive levels, specifically customized silicone wristbands, customized lanyards, and customized pin buttons. This horizontal price-fixing conspiracy is a *per se* violation of the Sherman Act.

73. Each Defendant committed at least one overt act, such as arranging with a competitor to set the price of Customized Promotional Products, to further the conspiracy alleged herein.

74. As a result of Defendants' unlawful conduct, prices for Customized Promotional Products were raised, fixed, maintained, and/or stabilized at supracompetitive levels in the United States.

75. The combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

76. For the purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators did those things they combined or conspired to do, including:

    (a)    participating in meetings and conversations to discuss each other's Customized Promotional Products business; and

    (b)    fixing, stabilizing, maintaining, or setting prices for Customized Promotional Products at supracompetitive levels.

77. As a result of Defendants' unlawful conduct, Plaintiff and other members of the Class have been injured in their business and property in that they have paid more for

Customized Promotional Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of members of the Class, respectfully requests that the Court enter judgment in their favor and against Defendants, as follows:

A. Certification of the proposed Class, including appointment of Plaintiff's counsel as Class Counsel;

B. Judgment in favor of herself and the Class she seeks to represent and against Defendants; and damages, measured as the overcharges that Plaintiff and other members of the Class paid as a result of Defendants' anticompetitive conduct, trebled;

C. An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

D. Injunctive relief to prevent further anticompetitive conduct;

E. Costs of suit, including reasonable attorneys' fees; and

F. Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial as to all issues so triable.

Dated:   January 8, 2018                    by:  */s/  Bruce W. Steckler*
                                                  Bruce W. Steckler
                                                  Texas Bar No. 00785039
                                                  **STECKLER GRESHAM COCHRAN**
                                                  12720 Hillcrest Road, Suite 1045
                                                  Dallas, TX 75230
                                                  Telephone: (972) 387-4040
                                                  Facsimile: (972) 387-4041
                                                  Bruce@Stecklerlaw.com

                                                  Austin B. Cohen (*to be submitted pro hac vice*)
                                                  Keith J. Verrier (*to be submitted pro hac vice*)
                                                  Charles E. Schaffer (*to be submitted pro hac vice*)

**LEVIN SEDRAN & BERMAN**
510 Walnut Street, Suite 500
Philadelphia, PA 19118
Telephone: (215) 592-1500
Facsimile: (215) 592-4663
acohen@lfsblaw.com
kjverrier@lfsblaw.com
cschaffer@lfsblaw.com

Joseph J. Siprut (*to be submitted pro hac vice*)
Stewart M.Weltman (*to be submitted pro hac vice*)
Todd McLawhorn (*to be submitted pro hac vice*)
**SIPRUT PC**
17 North State Street, Suite 1600
Chicago, IL  60602
Telephone: (312) 236-0000
Facsimile: (312) 878-1342
Jsiprut@siprut.com
sweltman@siprut.com
tmclawhorn@siprut.com

*Attorneys for Plaintiff and
the Proposed Class*